## Katzenmoyer's Estate

*J. Wilmer Fisher* and *R. T. Williamson*, for accountant.
*Ellis Brodstein*, for exceptant.

MARX, P. J., October 16, 1937.—This is the final account of Berks County Trust Company, trustee for Emma Katzenmoyer, et al., under a living trust agreement.

The account includes principal and income of the trust, and shows a balance due the estate on principal account of $1,663.94, and on income account of $154.26, a total of $1,818.20. Appended to the account is a statement that this aggregate balance is represented by a certificate of participation in Mortgage Pool Series "E." At the audit upon the account the accountant stated that as a result of par-

tial liquidation there was now in the aforesaid balance the sum of $28.50, reducing the income representation in that certificate by that amount. The face of the certificate is, accordingly, reduced to $1,789.70, and there is a cash income of $28.50. This certificate, together with the unconsumed cash balance, was tendered the settlor, upon termination of this trust, but was refused. The account having been filed, the settlor, on May 5, 1937, filed exceptions to the account. These exceptions, nine in number, challenge the investment made, the failure of the trustee to make settlement in cash, and the right of the trustee to tender, and of this court to decree distribution in kind. In disposing of these exceptions it will be necessary to thoroughly examine the nature and elements of the trust, its administration, and the grounds upon which the accountant seeks distribution in kind.

On November 17, 1926, the settlor, Emma Katzenmoyer, delivered to Colonial Trust Company of Reading, $1500 in cash. She declared a trust, in writing, the conditions of which were formally accepted by the Colonial Trust Company of Reading, named trustee. The settlor limited the terms of the trust in this language:

"The duties of the company acting in the above capacity will be to invest funds at 5% or better, pay income (after paying state tax and commission of 5%) to myself in accordance to my directions. At my death pay the fund to my sister, Mrs. Harry Redcay. In the event of my withdrawing any part of the fund I agree to give six (6) months' notice."

On October 1, 1927, the settlor declared a trust and the trustee accepted a trust in the sum of $1800 cash, deposited by the settlor, being the $1500 of the original trust, with $300 added thereto. The terms of the trust accepted on October 1, 1927, were identical with those of the trust accepted on November 17, 1926.

The Colonial Trust Company of Reading was succeeded by the Colonial-Northeastern Trust Company, which was succeeded by Berks County Trust Company, this account-

ant. At a continued hearing testimony was submitted tending to show the establishment, nature, administration and present condition of Mortgage Pool Series "E" of said Berks County Trust Company. This series of mortgages, generally called a pool, originated in the Colonial Trust Company of Reading, before its consolidation with other institutions. When it was eventually taken over by the Berks County Trust Company the designation "E" was first appended, to distinguish this series or pool from others under the administration of the Berks County Trust Company. Pool "E" was originated prior to 1927. A large number of individual mortgages were assembled, and against the aggregate of these were issued certificates of participation or interest. The certificates of participation never exceeded the aggregate face amount of the mortgages. Occasionally the outstanding certificates were less than the aggregate of the mortgages, in which case, the commercial side of the bank held an equivalent participating interest. These certificates or interests were sold to trust estates and to individuals. Mortgages on improved real estate were purchased and under resolutions of the board of directors, after inspection and approval, were added as elements in the pool. At the time of and prior to the time of the investment of this fund in this pool, all mortgages composing the pool were first mortgages and without default. The real estate had been examined, the mortgage loan formally approved, and the mortgage consigned to the pool. In 1931 or 1932 defaults in payment of interest or taxes, or both, began. It became necessary to foreclose some of the mortgages and purchase the real estate. At the time of the audit the pool included mortgages of the face value of $1,191,909.17, real estate costing the trustee $651,-879.78, judgments and notes obtained in settlement and on refinancing mortgage loans through the Home Owners Loan Corporation, $1,427.07, principal cash $13,486.11. The aggregate of these is $1,858,702.13. In 1932 the board of directors of the Berks County Trust Company

formally closed the pool and directed liquidation. No new mortgages or investments were placed in the pool, assets were placed in liquidation as expeditiously as possible, and a principal liquidation in the pool of approximately $500,000 has been accomplished. The maximum assets in the pool approximated $2,300,000. As liquidation was accomplished, distribution was made, pro rata, among the principal participants. The principal of this trust was accordingly reduced from $1800 to $1,663.94.

Relative to the authority of the trustee we find nothing in the trust agreement beyond this that the trustee is "to invest fund at 5% or better." It is directed to pay the net income to the settlor, during life and, after the death of the settlor, the principal to Mrs. Harry Redcay. The settlor agrees to give six months notice "in the event of [her] withdrawing any part of the fund." The settlor paid, and so stated, "cash." She directs the investment of the "fund" and directs payment of the "fund," after her death, to Mrs. Redcay. She speaks of the possibility of withdrawal of a part of the "fund." There is no express requirement of payment in cash.

The settlor offered and was permitted to introduce evidence tending to vary or reform the written contract between her and the trustee. She testified to an alleged conversation, prior to the execution of the first declaration of trust, with Mr. Miller, treasurer of the then trustee, to the effect that upon request, according to the terms of the trust, settlement would be made in cash. There was no further testimony on her part on this question. Mr. Miller, being called, testified to an entire want of knowledge of such a conversation, and there were no circumstances corroborating the testimony and claim of the settlor. In view of the claim it is very significant that the trust agreement of August 1, 1927, was couched in the identical language of the agreement of November 17, 1926. The settlor had seen and read this agreement and if there was a variance from the preceding conversations in the earlier trust, the same language should not have

been used in the later one. She accepted the later trust with the knowledge and understanding that the written contract again provided for the withdrawal, not of cash, but of the fund or any part of the fund. Our conclusion on this point is that the evidence presented by the settlor does not measure up to what is required for the reformation of a written instrument where fraud, accident, or mistake are alleged. See Sylvius v. Kosek, 117 Pa. 67, 76; Broida, to use, v. Travelers Ins. Co., 316 Pa. 444, 448. The contract between the parties must, accordingly, be accepted and considered as set forth in the writing of October 1, 1927.

In the words of this contract, the settlor deposited "cash." The duty of the trustee was to invest "fund," pay income as directed, and at the death of the settlor, pay "fund" to the settlor's sister. The parties agreed that there should be six months' notice "in the event of . . . withdrawing any part of the fund."

In Crick's Estate, 315 Pa. 581, the trustee was under the obligation to invest funds in first mortgages, or such securities as were further designated. The written contract provided that upon revocation or alteration of the contract, the settlor was "entitled to payment of funds so withdrawn" thirty days after notice. The settlor having been advised of a certain investment carried as an asset in the trust, objected, and the investment was changed. The trust was terminated upon the application of the settlor and a demand was made for the return of the principal in cash within thirty days. The court below declined to decree payment in cash. The Supreme Court affirmed. In concluding its decision the Supreme Court said (p. 586):

"Nothing has been done by the trustee contrary to law or in violation of its agreement with appellant. The participation certificate issued to appellant properly indicates his interest in the mortgage fund and cannot legally be objected to at this time."

To the same effect is Latshaw's Estate, 17 D. & C. 27.

It is entirely within the power of a Pennsylvania trust company to accept a trust and to agree to settlement in cash upon the termination thereof. Such a contract is not ultra vires: Osterling v. Commonwealth Trust Co., 320 Pa. 67. To enforce settlement in cash it is, however, essential that such settlement be required, by the contract, in unequivocal language. In Osterling's Estate, 324 Pa. 167, the trust agreement provided for termination upon fifteen days' notice by the settlor and required settlement in cash, after such notice. It further provided: "Should I [Osterling] die during the continuance of the trust estate hereby created, the whole of the estate then held in trust shall go to the executor named in my last will and testament." The court below held, the settlor having died, that the executors were required to take in kind the corpus of the trust: "There was nothing in the language of the agreement which required the trustee upon Osterling's death to turn over to the executors the amount of the cash the settlor, Osterling, originally placed in the trustee's hands for investment. Only unequivocal language could impose upon the trustee such a heavy and unusual obligation."

Section 49 (e) 1 of the Fiduciaries Act of June 7, 1917, P. L. 447, permits the court to decree distribution in kind, where it appears that the assets of the estate have not been converted, provided satisfactory reasons appear for failure to convert. We here find the reasons for failure to convert satisfactory. The investment was a lawful one, permitted under the terms of the contract, and was lawfully and properly administered until closing of the series or pool of mortgages, in which the estate had a participating interest. It was closed for purposes of liquidation. Liquidation progressed and part payment has been made on the principal of the trust. Although full payment of the principal of the trust is anticipated and contemplated, it is, nevertheless, true that the actual present value of the investment is problematical and the market for such an investment is highly speculative or

non-existent: McGuffey's Estate, 123 Pa. Superior Ct. 432, 439. Under the facts of this case no reason appears to warrant the conclusion that the trustee is under obligation to individually accept this investment and substitute cash. Distribution of the asset in kind will, accordingly, be decreed as requested.